**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ehorne@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BETH CONE, individually and on behalf of all others similarly situated, | Case No.  2:25-cv-1617 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| OVERDRIVE, INC., | |
| Defendant. | |

Plaintiff Beth Cone files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against OverDrive, Inc. ("Defendant" or "OverDrive"). Plaintiff brings this action based on personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who have accessed and used https://www.overdrive.com/ (the "Website"), which Defendant owns and operates as a leading library e-book platform.

2. Defendant aids, employs, agrees, and conspires with Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta") and Google LLC ("Google") (together, the "Third Parties") to eavesdrop on and intercept communications sent and received by Plaintiff and Class Members, including communications that contain protected "personal information," namely "information that relates to, or is capable of being associated with, a particular user's access to or use of a book service or a book." California Reader Privacy Act, Cal. Civ. Code § 1798.90(b)(5)(C). This is accomplished by Defendant installing Meta's tracking service "Meta Pixel" and Google's tracking service "Google Analytics" (the "Trackers") on the Website. By failing to procure consent before enabling Meta's and Google's interception of these communications, and by disclosing such information to the Third Parties, Defendant violated the California Invasion of Privacy Act ("CIPA") §§ 631-632.

## PARTIES

3. Plaintiff Beth Cone is a resident and citizen of West Hollywood, California, with an intent to remain there, and is over the age of 18.

4. Plaintiff Cone visited Defendant's Website, overdrive.com, on the same browser that she used to access her Facebook account and Google's products and

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    1

services[1] (including her Gmail account).  Plaintiff Cone was in California when she visited the Website.  Plaintiff has had an active Facebook account for over 10 years, and Plaintiff has also had an active Gmail account for over ten years.

5.    Upon accessing the Website, as alleged in greater detail below, Plaintiff Cone searched for, viewed, and read samples of digital books.  Each of these communications on the Website was intercepted in transit by Meta and Google—as enabled by Defendant—including communications that contain Plaintiff Cone's personally identifying information and protected personal book reading information as defined by Cal. Civ. Code § 1798.90(b)(5)(C).  Neither Defendant nor the Third Parties procured Plaintiff Cone's prior consent to this interception.

6.    Defendant OverDrive, Inc. is a Delaware corporation with its principal place of business at OverDrive World Headquarters, One OverDrive Way, Cleveland, Ohio 44125.  Defendant is a leading e-book platform that does business across the nation by partnering with public libraries.  Although its e-books and audiobooks are free for users with a library card, Defendant charges libraries exorbitant fees.[2]  As of 2021, OverDrive was the 35th-largest privately held company in Northeast Ohio.[3]

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action where there are more than 100 members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive

---

[1] *See* GOOGLE, PRODUCTS, https://about.google/intl/ALL_us/products/.

[2] Roose, Robert. *The True Cost of eBooks and Audiobooks for Libraries*. Spokane Public Library. Blog. Jan. 14, 2025, https://www.spokanelibrary.org/the-true-cost-of-ebooks-and-audiobooks-for-libraries. ("Since subscribing to OverDrive in 2012, which includes the Libby app (our primary eBook and audiobook platform), we've spent $3.3 million to buy or lease almost 87,000 copies. … The portion of our budget allocated for OverDrive content alone makes up more than a third of our annual $1.5 million materials budget.")

[3] Nobile, Jeremy, *Crain's Newsmakers of the Year*, CRAIN'S CLEVELAND BUSINESS (Mar. 26, 2021), https://www.crainscleveland.com/awards/steven-potash-newsmakers-year-2021.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    2

of interest, fees, and costs, and at least one member of the putative Class is a citizen of a state different from Defendant.

8.     The Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself of the laws and benefits of doing business in California, and Plaintiff's claims arise out of Defendant's forum-related activities. OverDrive does business across the nation including serving public libraries throughout Northern,[4] Southern[5], and Central[6] California.  In addition, Plaintiff accessed and navigated the Website while in California, and Defendant assisted the Third Parties with intercepting Plaintiff's communications in this District.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

## I.     OVERVIEW OF THE LAW

### A.     California Information Privacy Act

10.     The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens.  The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

11.     The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation

---

[4] OVERDRIVE, NORTHERN CALIFORNIA DIGITAL LIBRARY, https://ncdl.overdrive.com/support/members.

[5] OVERDRIVE, SOUTHERN CALIFORNIA DIGITAL LIBRARY, https://scdl.overdrive.com/.

[6] OVERDRIVE, https://company.overdrive.com/public-libraries/public-library-connect/ ("Schools & libraries across the country are connecting to get students reading more," highlighting OverDrives' partnership with the Fresno County Public Library in California.).

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    3

where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call.*" *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added)

12.   Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

13.   As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any … communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use … any information so obtained."

14.   CIPA § 631(a) also penalizes [iv] those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

15.   As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity

1    from "intentionally and without the consent of all parties to a confidential

2    communication, us[ing] an electronic amplifying or recording device to eavesdrop

3    upon or record [a] confidential communication."

4        16.    A "confidential communication" for the purposes of CIPA § 632 is "any

5    communication carried on in circumstances as may reasonably indicate that any party

6    to the communication desires it to be confined to the parties thereto."  Cal. Penal Code

7    § 632(c).

8        17.    Individuals may bring an action against the violator of CIPA §§ 631 and

9    632 for $5,000 per violation.  Cal. Penal Code § 637.2(a)(1).  Plaintiff does so, here,

10   against Defendant.

11       **B.    California Patron Use Records Act**

12       18.    The California Legislature enacted the Patron Use Records Act to

13   protect certain privacy rights of California citizens while accessing library services.

14       19.    The California Patron Use Records Act, Cal. Gov't Code § 7927.105,

15   prohibits the unauthorized disclosures of information that identifies a library patron's

16   "borrowing information or use of library information resources" and "[a]ny written

17   or electronic record that is used to identify a library patron."  Cal. Gov't Code §

18   7927.105(a).  The prohibited records that could be used to identify a patron

19   "include[], but is not limited to, a patron's name, address, telephone number, or

20   email address."  *Id.* at (a)(1).  And the prohibited records that identify a person's

21   borrowing information or use of library resources "includes, but is not limited to,

22   database search records, borrowing records, class records, and any other personally

23   identifiable uses of library resources, information requests, or inquiries."  *Id.* at

24   (a)(2).

25       20.    The statute prohibits disclosure of such information "to any person,

26   local agency, or state agency," except for use in library administrative duties, with

27   the patron's authorization in writing, or by court order, and creates a privacy interest

28

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                          5

1    for Californian library patrons in their personally identifiable information and their

2    borrowing information and library resource usage.  *Id.* at (c).

3        21.    As can be seen from the enaction of this statute, California has a strong

4    expressed legislative intent to protect the privacy rights of individuals' reading

5    materials and uses of research materials—going to lengths to ban disclosures of

6    which individual searched for or obtained which library materials and library

7    resource information.

8        22.    Here, Defendant's Website includes a prominent link to download

9    Libby from the Apple App Store, Google Play, Amazon Appstore or access it online

10    at Libbyapp.com.  Since only library patrons can access e-books and audiobooks on

11    the Website, it was set up by Defendant to allow the Third Parties to identify

12    Plaintiff as a library patron and intercept her "borrowing information or use of

13    library information resources."  This statute states that "[a]ll patron use records of a

14    library that is in whole or in part supported by public funds shall remain

15    confidential."  Cal. Gov't Code § 7927.105(c).  Thus, the statute implies that all the

16    foregoing communications should be protected from disclosure to third parties like

17    Meta and Google without Plaintiff's knowledge or consent.

18        **C.    California Reader Privacy Act**

19        23.    The California Reader Privacy Act, Cal. Civ. Code § 1798.90, was

20    enacted to prevent providers of book services from disclosing or being compelled to

21    disclose "any personal information relating to a user of the book service."

22    Legislative Counsel's Digest to Cal. Civ. Code § 1798.90.  The statute prohibits

23    "commercial entit[ies] offering … book service[s] to the public" from "knowingly

24    disclos[ing] to any government entity," or being "compelled to disclose to any

25    person[] [or] private entity" a user's "personal information."  *Id.*

26

27

28

24.     A "[b]ook service" is defined as a service that primarily "provides the rental, purchase, borrowing, browsing, or viewing of books."[7]  Cal. Civ. Code § 1798.90(b)(2).  Defendant's Website constitutes a book service here.

25.     "Personal information" is defined as:

> (A) Any information that identifies, relates to, describes, or is associated with a particular user, including, but not limited to, the information specifically listed in Section 1798.80.

> (B) A unique identifier or Internet Protocol address, when that identifier or address is used to identify, relate to, describe, or be associated with a particular user or book, in whole or in partial form.

> (C) Any information that relates to, or is capable of being associated with, a particular user's access to or use of a book service or a book, in whole or in partial form.

Cal. Civ. Code § 1798.90(b)(2).

26.     While this statute focuses on prohibiting disclosures of personal information to government entities, the explicit ban on disclosing "personal information relating to a user of [a] book service" further demonstrates California's strong intent in protecting the private reading and reading-material browsing history of its citizens.

27.     Here, Website users' communications with OverDrive—made while browsing e-books and audiobooks via the Website—contain personal and confidential private reading information as defined by Cal. Civ. Code § 1798.90.

28.     As described *infra*, §§ IV, VI, Defendant enables Meta to identify individual Website users by their respective Facebook accounts, utilizing several cookies, including the c_user; datr; fr; and _fbp cookies. Defendant also enables Meta

---

[7] The statute explicitly carves out stores that sell "a variety of consumer products" with book service sales that "do not exceed 2 percent of the store's total annual gross sales of consumer products sold in the United States," which is not applicable to Defendant here.  Cal. Civ. Code § 1798.90(b)(2).

to identify individual Website users through advanced matching, by which Meta records the contact details Website users provide on the Website (i.e., name, email address, phone number, etc.). These pieces of data collected by Meta constitute communications that "identif[y], relate[] to, describe[], or [are] associated with a particular user." Cal. Civil Code § 1798.90(b)(2), as the cookies and other IDs at issue contain "unique identifying number[s]" assigned to Website users (*id.*) and the contact details (i.e., name, email address, phone number, etc.) at issue are sufficient to identify individuals. *Id.*

29.    Also as described *infra*, §§ IV, VI, Defendant enables Google to identify individual Website users with Google Analytics identity spaces—that is, a combination of user IDs, user-provided data (i.e., contact details like email address, phone number, name, and/or address, etc.), device IDs, and/or machine learning-based behavioral modeling—and Google signals (which associates web browsing activity with users' Google accounts). These pieces of data collected by Google constitute communications that "identif[y], relate[] to, describe[], or [are] associated with a particular user." Cal. Civil Code § § 1798.90(b)(2), as they contain "[a] unique identifier or Internet Protocol address" assigned to Website users and other personal information associated with Website users. *Id.*

30.    Thus, the Third Parties—as aided by Defendant—intercepted "personal information" which is confidential, under Cal. Civil Code § § 1798.90. Therefore, Defendant's conduct here at issue though not prohibited by, *inter alia*, Cal. Civil Code § § 1798.90, certainly would be disfavored.

**III.    Overview of Defendant's Website**

31.    Defendant owns and operates the Website. Defendant has integrated the Third Parties' wiretaps into the Website.

32.    On the Website, users can browse and search for free e-books and

audiobooks.[8]  When doing so, Website users provide Defendant with protected "personal information," namely "information that relates to, or is capable of being associated with, a particular user's access to or use of a book service or a book." California Reader Privacy Act, Cal. Civ. Code § 1798.90(b)(5)(C).  *See supra* § II.

33.    Unbeknownst to Plaintiff and Class Members, however, Defendant aids, agrees with, employs, or otherwise enables the Third Parties to eavesdrop on those confidential communications using the Third Parties' respective wiretaps, as set out *infra*.

34.    Website users' confidential communications are the product of Website users affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not procedurally or automatically generated). Instead, as set out below, the confidential communications stem from Website users typing into data fields and actively making other selections.  All of the foregoing is information created through the intent of Website users: information created by and in response to Website users' communicative inputs; information created by and in response to Website users' intended messages to the Website and Defendant; and information created by and in response to Website users' having conveyed and expressed their respective desires that the Website would supply them with certain, highly personalized, types of information and/or responses.

35.    Upon accessing the Website, Plaintiff Cone clicked on the button "Browse our collection" to search OverDrive's catalog of digital books.  *See* Figure 1.

---

[8] OVERDRIVE, https://www.overdrive.com/.

**Figure 1**.



36.    After clicking the "Browse our collection" button on the Website, Website users, like Plaintiff, are shown a page where they can either search the collection using a Search by title or author bar or click on one of the many genre options provided, such as Fantasy, Literature, Science Fiction, as seen in Figure 2.

**Figure 2.**



37.     After searching on the Website, users like Plaintiff are able to click on and view reading materials that they are interested in.  Figure 3 depicts a user viewing the same e-book that Plaintiff Cone viewed on the Website, *The Most Fun We Ever Had* by Claire Lombardo.  Notably, the Website provides users like Plaintiff with the opportunity to "Read A Sample." *See* Figure 3.

**Figure 3.**



38.     Clicking on "Read A Sample" allows users like Plaintiff to read an excerpt of the selected and viewed reading materials.  *See* Figure 4.

//

//

//

//

//

//

//

**Figure 4**.



39.     When Plaintiff Cone used the Website to search for and read a sample of *The Most Fun We Ever Had*, Defendant intercepted her communications with the Website.  Defendant then disclosed this information in conjunction with Plaintiff's personally identifiable information ("PII") to the Third Parties.  Specifically, because of Defendant's unlawful conduct as alleged herein, the Third Parties helped Defendant intercept and collect information about Plaintiff Cone's search history and reading preferences on the Website.

40.     At all relevant times, Plaintiff never consented to, agreed to, or otherwise permitted Defendant to disclose her personally identifiable information and the record of reading materials that Plaintiff Cone viewed on the Website to third parties, including to Meta and Google.

41.    Likewise, Defendant never gave Plaintiff the opportunity to prevent the disclosure of her personally identifiable information and the record of reading materials that Plaintiff Cone viewed on the Website to the Third Parties.

42.    Pursuant to the systematic process described herein, Defendant assisted the Third Parties with intercepting Plaintiff Cone's protected communications on the Website without her consent, including those that contained personally identifiable book reading "personal information" as defined by Cal. Civ. Code § 1798.90(b)(5)(C).

43.    By failing to receive the requisite consent from Plaintiff, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff Cone's personally identifiable information and protected reading preferences to the Third Parties.

44.    Plaintiff Cone, while visiting Defendant's Website and searching for digital materials, found out that if Website users want to obtain an e-book or audiobook from Defendant's Website, they must download the Libby App, owned, designed and maintained by OverDrive, but they must be library patrons to use it: that is, they can only obtain digital materials if they have a library card from one of the libraries partnering with Defendant.  Defendant explains on its Website how Libby works.[9]

45.    After downloading the Libby App, Plaintiff was asked if she had a library card.  After clicking Yes, I have a library card, to the prompt, she entered "LA County Library" and found it.  She then was prompted to enter her library card number, which she did.  Afterwards she again searched for *The Most Fun We Ever Had* and learned that no copies were available.  Plaintiff placed a digital hold on the e-book, which placed her name on a waitlist for it.

46.    On or about February 4, 2025, Plaintiff Cone was informed by email from OverDrive that the LA County Library now had a copy of *The Most Fun We Ever Had*

---

[9] OVERDRIVE, https://www.overdrive.com/apps/libby#GettingStarted.

for her to borrow.  Plaintiff borrowed the digital book and downloaded it onto her Kindle App.

## IV.    Overview of the Third Parties' Tracking Technologies

### A.    Background

47.    Meta and Google wiretap the Website with their respective tracking technologies, which Defendant purposefully installed on the Website.

48.    The Third Parties' tracking technologies send secret instructions to a Website user's browser, without alerting the individual that this is happening.  The trackers then cause the browser to secretly and simultaneously duplicate the user's Website communications, transmitting these communications to the Third Parties' servers alongside additional information about the Website user's identity.  This entire process occurs within milliseconds.  In other words, when a user communicates with Defendant's Website, those communications are simultaneously and contemporaneously duplicated and sent to the Third Parties at the same time as they are being sent to Defendant.  Thus, the Third Parties' interception of these communications occurs "in transit."  *See, e.g.*, *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…"); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device. Section 631's protections extend explicitly to the beginnings and ends of communications…"); *James v. Walt Disney Co.,* 701 F. Supp. 3d 942, 962 (N.D. Cal. 2023), <u>motion to certify appeal denied,</u> No. 23CV02500EMCEMC, 2024 WL 664811 (N.D. Cal. Feb. 16, 2024) (finding in-transit interception was alleged based on similar process to the one alleged herein).

**B.    Meta**

49.    Meta wiretaps the Website with trackers associated with the "Meta Pixel."[10]    According to Meta, "[t]he Meta Pixel is a snippet of JavaScript code that allows [clients] to track visitor activity on [their] website[s]. It works by loading a small library of functions which [] can [be] use[d] whenever a site visitor takes an action (called an event) that [a client] want[s] to track (called a conversion)."[11]    Meta offers a menu of "standard events" that can be tracked, including what content a visitor views or purchases.[12]    Advertisers can also create their own tracking parameters by building a "custom event."[13]    Thus, the Meta Pixel helps "understand[] the actions people take on [a] website."[14]

50.    The Meta Pixel "relies on Facebook cookies, which enable [Meta] to match [] website visitors to their respective Facebook User accounts."[15]    Additionally, "[w]ith advanced matching, [website operators] can send [Meta] hashed customer information along with [] Meta Pixel events, which can help … match more of the conversions that happen on your website to people on Meta."[16]

51.    This is highly useful for marketing and advertising.    Specifically, the Meta Pixel can be used to help "measure ad effectiveness"; "define custom audiences

---

[10] META, META PIXEL, https://developers.facebook.com/docs/meta-pixel.

[11] *Id.*

[12] META, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655.  *See also* META, STANDARD EVENTS, https://developers.facebook.com/docs/meta-pixel/reference.

[13] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005; *see also* META, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[14] *Id.*

[15] META, META PIXEL GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

[16] META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

---

for ad targeting"; and support "Advantage+ catalog ads campaigns[.]"[17]

52.    As to measuring ad effectiveness, "[t]rack[ing] website visitors' actions[,] also known as conversion tracking[,] ... can be used to … calculate [] return[s] on ad investment[s]."[18] "In [the] Meta Ads Manager, [website operators] can see how many conversions happened as a result of [their] Meta ads."[19] This includes "cross-device reporting, which lets [advertisers] see cross-device conversions across apps and the web (for example, if a customer sees an ad for a product on their mobile phone, but decides to buy it later on their desktop computer)."[20]

53.    A "custom audience is an ad targeting option"[21] that can be used by advertisers, like Defendant, "to find people most likely to respond to [their] ad[s]."[22] Clients can "[c]reate [an] online audience based on the traits of who [they] want to see [their] ad[s], and narrow down [their] ad[s'] audience[s] by interests, gender or location and use ad targeting to find the people most likely to take action. Once [an] ad starts running, [Meta's] system will learn who is engaging with it and, over time, narrow [the] audience [to help] reach more of the right people."[23] Advertisers can target, *inter alia*, "[n]ew customers with specific interests or from a specific location"; "[p]eople who have already shown an interest in [a client's] business"; and "[p]eople who share interests with [a client's] current customers[]" (*i.e.*, "Lookalike

---

[17] META, META PIXEL, https://developers.facebook.com/docs/meta-pixel.

[18] META, CONVERSION TRACKING, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking.

[19] META, USE CONVERSION TRACKING TO MEASURE RESULTS, https://www.facebook.com/business/help/339239069606476.

[20] *Id.*

[21] META, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227.

[22] META, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting.

[23] *Id.*

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    16

Audience[s]").[24]

54.    "Advantage+ catalog ads are dynamically created by populating an ad template with product information found in a data feed. This allows [Meta clients] to create thousands of ads without having to configure each of them individually."[25] Clients "can also use Advantage+ catalog ads to target visitors based on how they have interacted with [their] website in the past."[26]

## C.    Google Analytics

55.    Google wiretaps the Website with trackers associated with "Google Analytics."[27]  According to Google, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[28]  "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site."[29]  Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page."[30]  Specifically, Google Analytics tracks "events"; "sessions"; and "users[.]"[31]

56.    "Events let [clients] measure … when someone loads a page, clicks a link, [] makes a purchase[]" and more.[32]  Google provides a menu of "recommended

---

[24] *Id.*

[25] META, META PIXEL FOR ADVANTAGE+ CATALOG ADS, https://developers.facebook.com/docs/meta-pixel/get-started/advantage-catalog-ads.

[26] *Id.*

[27] GOOGLE, START LEARNING ABOUT GOOGLE ANALYTICS, https://developers.google.com/analytics.

[28] GOOGLE, HOW GOOGLE ANALYTICS WORKS, https://support.google.com/analytics/answer/12159447.

[29] *Id.*

[30] *Id.*

[31] GOOGLE, TRAFFIC-SOURCE DIMENSIONS, https://support.google.com/analytics/answer/11080067.

[32] GOOGLE, SET UP EVENTS, https://developers.google.com/analytics/devguides/collection/ga4/events.

---

events" (i.e., "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; "views their shopping cart")[33] and also allows for "collect[ing] additional information that Google Analytics does not collect automatically[,]" through "custom events."[34]

57.     A "session" is "the period from when a user visits [a] website or app to when they leave [said] website or app[.]"[35]    "When a session starts, Google automatically collects a session_start event and generates a session ID (ga_session_id) and session number (ga_session_number)[.]"[36]

58.     Finally, to discern when "two different [users] interact with [a] website[,] ... Google Analytics identifies an individual user based on [Google Analytics] reporting identit[ies.]"[37]    Reporting identities are combinations of "identifiers ... called *identity spaces*" – namely, "User-ID"; "user-provided data"; "device ID"; and "modeling[.]"[38]

- A "User-ID" is a "persistent ID[,]"[39] consisting of a unique combination of up to "256 characters[,]"that is created by website operators and "assign[ed] and consistently reassign[ed]

---

[33] GOOGLE, [GA4] RECOMMENDED EVENTS,
https://support.google.com/analytics/answer/9267735.

[34] GOOGLE, [GA4] CUSTOM EVENTS,
https://support.google.com/analytics/answer/12229021.

[35] GOOGLE, TRAFFIC-SOURCE DIMENSIONS,
https://support.google.com/analytics/answer/11080067.

[36] GOOGLE, [GA4] ABOUT ANALYTICS SESSIONS,
https://support.google.com/analytics/answer/
9191807.

[37] GOOGLE, TRAFFIC-SOURCE DIMENSIONS,
https://support.google.com/analytics/answer/11080067.

[38] GOOGLE, [GA4] REPORTING IDENTITIES,
https://support.google.com/analytics/answer/10976610.

[39] *Id.*

---

… to [] users[,] … typically [] during login."[40]

- "User-provided data" consists of contact details such as "email, phone, name and address[,]" provided by website users, that "is [] matched with other Google data … to improve the accuracy of [] measurement data and power enhanced Analytics capabilities."[41]   Although these personal details are "hashed,"[42] the reality is that, even in hashed form, they are traceable to individuals.[43]

- A "device ID" is a "browser-based or mobile-app-based identifier[.]"[44] "On a website, device ID gets its value from the client ID property of the _ga cookie. In an iOS or Firebase app, device ID gets its value from the app-instance ID, which identifies a unique installation of the app."[45]

---

[40] Google, [GA4] Measure Activity Across Platforms with User-ID, https://support.google.com/analytics/answer/9213390.

[41] Google, [GA4] User-Provided Data Collection, https://support.google.com/analytics/answer/14077171.

[42] Id.

[43] See, e.g., Federal Trade Commission, Does Hashing Make Data "Anonymous"?, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data is risky at best, and usually wrong."); Federal Trade Commission, No, Hashing Still Doesn't Make Your Data Anonymous, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized."); Steven Englehardt et al., I Never Signed Up for This! Privacy Implications of Email Tracking, https://petsymposium.org/2018/files/papers/issue1/paper42-2018-1-source.pdf ("[H]ashing of PII, including emails, is not a meaningful privacy protection. This is folk knowledge in the security community, but bears repeating."); MarTech, FTC PrivacyCon: Your Email Address is Leaking and Vulnerable, https://martech.org/ftc-privacycon-email-address-leaking-vulnerable ("Hashing is an algorithmic process that turns [information] into a gibberish label[.] … Although gibberish, it's unique, so it can be employed as an anonymized identifier. It's supposed to be one-way, meaning that you can't turn the gibberish back into the [original form]. Wrong, says Englehardt and his colleagues.").

[44] Google, [GA4] Device ID, https://support.google.com/analytics/answer/9356035.

[45] Id.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    19

- "Modeling" uses "machine learning to model the behavior of users who decline analytics cookies based on the behavior of similar users who accept analytics cookies."[46]

59.     Google Analytics can also leverage "Google signals," which "associates [data] with user[s'] … Google accounts," for "users who have signed in …  and who have turned on Ads Personalization."[47]  "This association of data with these signed-in users is used to enable cross-device remarketing, and cross-device key events export to Google Ads."[48]

## V.    Defendant Aids, Agrees with, Employs, or Otherwise Enables the Third Parties to Wiretap Californians' Communications

### A.    Meta

60.     Meta, as enabled by Defendant, contemporaneously intercepts users' communications with the Website.

61.     As shown by the red highlights in the below excerpt of the Website's transmissions, Meta intercepts the personally identifying information (in the form of c_user cookie) and the digital books searched and selected by users (here, "*The Most Fun We Ever Had*").



---

[46] GOOGLE, [GA4] BEHAVIORAL MODELING FOR CONSENT MODE, https://support.google.com/ analytics/answer/11161109.

[47] GOOGLE, [GA4] ACTIVATE GOOGLE SIGNALS FOR GOOGLE ANALYTICS PROPERTIES, https://support.google.com/analytics/answer/9445345.

[48] *Id.*

---

62.     In addition, the red highlights in the following excerpt of the Website's transmissions demonstrate Meta intercepting when a user selects a book or ebook to view (here, "*The Most Fun We Ever Had*").



63.     Finally, the red highlights in the following excerpt of the Website's transmissions demonstrate Meta intercepting when a user reads a sample of a book on the Website (here, "*The Most Fun We Ever Had*").



CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    21

64.    These communications are the product of searches and button clicks related to Figures 2 and 4.

**B.    Google**

65.    Google, as enabled by Defendant, contemporaneously intercepts users' communications with the Website.

66.    As shown in the below excerpt of the Website's transmissions, Google intercepts the digital reading materials searched by users (here, "*The Most Fun We Ever Had*").

```
sid: 1740436668
sct: 7
seg: 1
dl: https://www.overdrive.com/search?q=the+most+fun+we+ever+had&f-formatClassification=
dt: 10 results for the most fun we ever had · OverDrive: Free ebooks, audiobooks & movies from your library.
en: view_search_results
```

67.    In addition, as shown in the below excerpt of the Website's transmissions, Google intercepts the digital reading materials that users click on to view (here, "*The Most Fun We Ever Had*").

```
sid: 1740436668
sct: 7
seg: 1
dl: https://www.overdrive.com/media/4281345/the-most-fun-we-ever-had
dt: The Most Fun We Ever Had by Claire Lombardo · OverDrive: Free ebooks, audiobooks & movies from your library.
en: page_view
```

//

//

//

//

//

//

//

68.    Further, as shown in the below excerpt of the Website's transmissions, Google intercepts the digital reading materials that users view samples for (here, "*The Most Fun We Ever Had*").



```
sid: 1740436668
sct: 7
seg: 1
dl: https://www.overdrive.com/media/4501374/the-most-fun-we-ever-had
dt: The Most Fun We Ever Had by Claire Lombardo · OverDrive: Free ebooks, audiobooks & movies from your library.
en: sample
ep.userId:
ep.session_status: anonymous
ep.platform_version: 3.4.1289.0
ep.doc_referrer:
ep.doc_referrer_hostname: www.overdrive.com
ep.format: ebook
```

69.    These communications are the product of searches and button clicks related to Figures 2 and 4.

## VI.    Defendant Enables the Third Parties to Pair the Above Data with Users' Identities

70.    As discussed *supra*, § IV, the Meta and Google tracking technologies at issue can pair wiretapped data with website users' identities.

71.    The tracking technologies achieve this, at least in part, through cookies. A cookie is a "small text file (up to 4KB) created by a website that is stored in the user's computer either temporarily for that session only or permanently in storage (persistent cookie)."[49]  Persistent cookies can be used to "track user behavior across different sites. They store information such as geographic location, device specifications, and specific actions taken on the website."[50]

---

[49] PC MAGAZINE, COOKIE TABLE,
https://www.pcmag.com/encyclopedia/term/cookie.

[50] COOKIEBOT, WHAT ARE TRACKING COOKIES AND HOW DO THEY WORK?,
https://www.cookiebot.com/en/tracking-cookies/.

**A.    Meta**

72.    Through Facebook cookies, Meta can identify individual website users by their respective Facebook accounts.  Through advanced matching, Meta can also identify individual website users by the personal information they provide on websites (i.e., name, email address, phone number, etc.).

73.    The main identifier Meta uses is one that even an ordinary person could uncover: the c_user cookie.  The c_user cookie contains, at least, the user's unencrypted Facebook ID.[51]  The c_user cookie has a lifespan of three hundred sixty-five days.[52]

74.    In the following screenshot of the network transmissions, the red squares confirms that, when a user accesses the Website while logged into Facebook, the Meta tracking technologies on the Website compel that user's browser to transmit a user's c_user cookie.



---

[51] MICROSOFT, COOKIE COMPLIANCE, https://learn.microsoft.com/en-us/dynamics365/commerce/cookie-compliance ("Cookie[:] c_user[.] Description[:] Cookie contains the user ID of the currently signed-in user.").

[52] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

75.    In addition, Meta also intercepts Defendant's transmission of several other cookies, including but not limited to the datr; fr; and _fbp[53] cookies. The following excerpted network transmissions are demonstrative:



76.    The datr cookie contains, at least, a value that uniquely identifies a browser.[54]  The datr cookie has a lifespan of four hundred days.[55]

77.    The fr cookie contains, at least, a value that uniquely identifies a browser

---

[53] Note, the Meta Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, the Website. PC MAGAZINE, FIRST-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/first-party-cookie. A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook. PC MAGAZINE, THIRD-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.  Pictured here and in the *infra* two images is the _fbp cookie, sent as a first-party cookie.

[54] *Id.* ("'Datr' is a unique identifier for your browser[.]").

[55] *Id.*

---

1    and the user's encrypted Facebook ID.[56]  The fr has a lifespan of ninety days.[57]

2         78.    The _fbp cookie contains, at least, a value that uniquely identifies a

3    browser.[58]  The _fbp has a lifespan of ninety days.[59]

4         79.    When a Website visitor's browser has recently logged out of an account,

5    Facebook compels the visitor's browser to send a smaller set of cookies, including but

6    not limited to the datr, fr, and _fbp cookies.

7         80.    No matter the circumstances, Facebook compels the visitor's browser to

8    transmit the _fbp cookie.

9         81.    Defendant also uses "Advanced Matching."  With Advanced Matching,

10   Defendant's Meta Pixels "look for recognizable form field and other sources on [the]

11   website that contain information such as first name, last name and email."[60]  That

12   information is recorded, "along with the event, or action, that took place."[61]

13        82.    Specifically, as part of Advanced Matching, Defendant enabled

14   "Automatic Advanced Matching."  That means Defendant configured the pixel to

15

16   ───────────────

     [56] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-
17   AUDIT (Sept. 21, 2012),  http://www.europe-v-facebook.org/ODPC_Review.pdf
     ("The first part of the cookie is a browser ID, used to identify the web browser. The
18   second part of the cookie is an encrypted version of the logged in user's Facebook
     ID.").

19   [57] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES,
     https://www.facebook.com/policy/
20   cookies/.

21   [58] Id. ("Cookie[:] _fbp[.] Description[:] These cookies identify browsers for
     businesses using our Meta Products for the purposes of providing advertising and
22   site analytics services."). See also FACEBOOK, CUSTOMER INFORMATION
     PARAMETERS, https://developers.facebook.com/docs/
23   marketing-api/conversions-api/parameters/customer-information-parameters#fbp
24   ("The Facebook browser ID value is stored in the _fbp browser cookie[.]").

25   [59] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES,
     https://www.facebook.com/policy/
26   cookies/.
     [60] META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/
27   business/help/611774685654668.

28   [61] Id.

───────────────

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    26

scan form fields containing a user's email address, first name, last name, phone number, gender, zip code, city and state.[62]

83.    Thus, Meta, as enabled by Defendant, contemporaneously intercepts users' names, email address, phone numbers, and/or other personal details using the Meta Pixel on various pages of the Website.  Although these personal details are "hashed,"[63] the reality is that, even in hashed form, they are traceable to individuals.[64]

84.    Defendant discloses this information to Meta so that Meta can better match Website visitors to their Facebook profiles, thereby helping Defendant

---

[62] *See* META, ADVANCED MATCHING, https://developers.facebook.com/docs/meta-pixel/advanced/
advanced-matching; META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/
business/help/611774685654668.

[63] *Id.*

[64] *See, e.g.*, FEDERAL TRADE COMMISSION, DOES HASHING MAKE DATA "ANONYMOUS"?, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data is risky at best, and usually wrong."); FEDERAL TRADE COMMISSION, NO, HASHING STILL DOESN'T MAKE YOUR DATA ANONYMOUS, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized."); STEVEN ENGLEHARDT ET AL., I NEVER SIGNED UP FOR THIS! PRIVACY IMPLICATIONS OF EMAIL TRACKING, https://petsymposium.org/2018/files/papers/issue1/
paper42-2018-1-source.pdf ("[H]ashing of PII, including emails, is not a meaningful privacy protection. This is folk knowledge in the security community, but bears repeating."); MARTECH, FTC PRIVACYCON: YOUR EMAIL ADDRESS IS LEAKING AND VULNERABLE, https://martech.org/ftc-privacycon-email-address-leaking-vulnerable ("Hashing is an algorithmic process that turns [information] into a gibberish label[.] … Although gibberish, it's unique, so it can be employed as an anonymized identifier. It's supposed to be one-way, meaning that you can't turn the gibberish back into the [original form]. Wrong, says Englehardt and his colleagues.").

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    27

"[i]ncrease the number of attributed conversions," "[i]ncrease [their] Custom Audience size," and "[d]ecrease the cost per conversion."[65]

**B.    Google**

85.    To identify individual website users, Google cookies allow Google Analytics to "'remember' what a user has done on previous pages [and their] interactions with the [W]ebsite."[66]

86.    The following image confirms that, when a user accesses the Website while logged in to a Google account, the Google tracking technologies on the Website compel that user's browser to transmit several Google cookies, including but not limited to: NID; _Secure3PSID; _Secure-3PAPISID; _Secure-3PSIDCC; and



_Secure-3PSIDTS cookies:

87.    The NID cookie "is used to collect website statistics and track conversion rates and Google ad personalization[.]"[67]  The NID cookie has a lifespan of 1 year.[68]

88.    The _Secure-3PAPISID cookie "[p]rofiles the interests of website visitors to serve relevant and personalised ads through retargeting."[69]  The _Secure-

---

[65] META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668.

[66] GOOGLE, GOOGLE ANALYTICS COOKIE USAGE ON WEBSITES, https://web.archive.org/web/20240303080533/https://developers.google.com/analytics/devguides/collection/analyticsjs/cookie-usage.

[67] *Id.*

[68] *Id.*

[69] *Id.*

3PAPISID cookie has a lifespan of 2 years.[70]

89.    The _Secure3PSID cookie is a "[t]argeting cookie[ u]sed to profile the interests of website visitors and display relevant and personalised Google ads."[71]  The _Secure3PSID cookie has a lifespan of 2 years.[72]

90.    The _Secure-3PSIDCC and _Secure-3PSIDTS cookies are "[t]argeting cookie[s u]sed to create a user profile and display relevant and personalised Google Ads to the user."[73]  The _Secure-3PSIDCC and _Secure-3PSIDTS cookies have a lifespan of 2 years.[74]

### C.    IP Address

91.    In addition, both of the Third Parties receive users' IP addresses with each intercepted communication on the Website.[75]

92.    An IP address is a "unique number that's assigned to every computer or other device that connects to the Internet."[76]  IP addresses "can often be used to identify the location from which a computer is connecting to the Internet."[77]  And when a user "send[s] or request[s] information online, [their] IP address acts as an identifier so the information can reach [their] specific device."[78]  Therefore, an IP address is required for users to use the Internet and, in this case, is required to be able to search for and

---

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *See, e.g.*, GOOGLE, IP ADDRESS, https://support.google.com/google-ads/answer/6322?hl=en&sjid=10351485279015731074-NA; META, PRIVACY CENTER, https://www.facebook.com/privacy/dialog/what-location-information-does-meta-receive/ ("We're also able to receive location information from the network you connect your device to, including your IP address and Wi-Fi connection.").

[76] *Id.*

[77] *Id.*

[78] Norton, *What is an IP Address*, Blog, https://us.norton.com/blog/privacy/what-is-an-ip-address.

---

1    review reading materials on the Website.

2    **VII.   The Third Parties Use Californians' Data for Their Own Purposes**

3        93.    When the Third Parties use their respective wiretaps on Website users'

4    communications, the wiretaps are not like tape recorders or "tools" used by one party

5    to record the other.  Instead, the Third Parties—separate and distinct entities from the

6    parties to the conversations—use the wiretaps to eavesdrop upon, record, extract data

7    from, and analyze conversations to which it is not a party.   The Third Parties

8    themselves, collect the contents of said conversations.  That data is then analyzed by

9    the Third Parties before being provided to any entity that was a party to the

10    conversations (like Defendant).

11        94.    The Third Parties have the capability to use the contents of

12    conversations they collect through their respective wiretaps for their own purposes.

13        95.    In its "Meta Business Tools Terms,"[79] Meta confirms that it has the

14    capability to use information it collects for purposes other than recording it and

15    conveying it to Defendant.  For instance, Meta can use the information it collects "to

16    promote safety and security on and off the Meta Products, for research and

17    development purposes and to maintain the integrity of and to provide and improve the

18    Meta Products."[80]  Further, Meta can "disclose [] Campaign Reports or Analytics …

19    to [] third part[ies,] … [if] they have been combined with Campaign Reports and

20    Analytics from numerous other third parties and [the advertiser using the Meta

21    Business Tools has had its] identifying information [] removed from the combined

22    Campaign Reports and Analytics."[81]  And Meta can use the information it collects to

23    "improve the effectiveness of ad delivery, [] determine the relevance of ads to people[,]

24    … [and] personalize the features and content (including ads and recommendations)

25

26    [79] META, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.

27    [80] *Id.*

28    [81] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    30

that [Meta] show[s] people on and off [] Meta Products."[82]    Thus, Meta has the capability to use the wiretapped data for purposes other than simply providing a recording to Defendant, including, but not limited to, its own research and development; ad delivery; feature and content personalization; and product improvement, provision, and securement.

96.    In its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "When Google Analytics customers enable the data sharing setting for … Google Analytics[] and accept the 'Measurement Controller-Controller Data Protection Terms' … Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance."[83]    Thus, Google has the capability to use the wiretapped data for understanding online behavior and trends, machine learning, and improving its products and services.

## VIII. Defendant Never Received Users' Consent to Disclose their Confidential Communications to the Third Parties

97.    Crucially, neither Defendant nor the Third Parties procure prior consent from Californians for Meta or Google to engage in this wiretapping.

98.    Nowhere on the Website does Defendant provide notice of its privacy-related practices that is prominently displayed, designed to attract Website users' attention, and distinctive in appearance.

---

[82] *Id.*
[83] GOOGLE, SHARED DATA UNDER MEASUREMENT CONTROLLER-CONTROLLER DATA PROTECTION TERMS, https://support.google.com/analytics/answer/9024351.

99.    Nowhere on the Website does Defendant adequately disclose the tracking here at issue, including that:

- The Third Parties, as enabled by Defendant, intercept the contents of Californians' communications on the Website, in real time.

- These communications include, but are not limited to, "personal information," which is "information that relates to, or is capable of being associated with, a particular user's access to or use of a book service or a book" under Cal. Civil Code § 1798.90(5)(C). Namely, the Third Parties intercept Website users' searches and button clicks selecting titles of books to browse or read.  The Third Parties also intercept the URLs of webpages visited by Website users – containing the foregoing communications.

- This information is not anonymized because Defendant enables the Third Parties to link users' communications with personal information that reveals their identities.   Such personal information includes cookie IDs/the values contained in cookies, cross-device IDs, device IDs, email addresses, and/or phone numbers.  It also includes Google Analytics identity spaces – a combination of user IDs, user-provided data (i.e., contact details like email address, phone number, name, and/or address, etc.), device IDs, and/or machine learning-based behavioral modeling – and Google signals (which associates web browsing activity with users' Google accounts).  These are records that "identif[y], relate[] to, describe[], or [are] associated with a particular user." Cal. Civil Code § 1798.90(5)(A).

100.    Nowhere on the Website does Defendant request or receive Website users' affirmative consent *prior to* enabling the Third Parties' tracking technologies. Analysis of the Website reveals that the Third Parties' tracking technologies are active as soon as the Website loads, before Website users could even conceivably be put on notice or provide affirmative consent.

## **CLASS ALLEGATIONS**

101.    Plaintiff seeks certification of the following class: all California residents who have accessed and navigated the Website while in California (the "Class").

---

102.    Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

103.    The following people are excluded from the Class: (1) any Judge presiding over this action and members of her or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

104.    **Numerosity:** The number of persons within the Class is substantial and believed to amount to thousands, if not millions of persons.  It is, therefore, impractical to join each member of the Class as a named plaintiff.  Further, the size and relatively modest value of the claims of the individual members of the Class render joinder impractical.   Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.   Moreover, the Class is ascertainable and identifiable from Defendant's records.

105.    **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated CIPA §§ 631 and 632 and whether Plaintiff and the

proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

106. **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other class members, visited the Website and had her confidential electronic communications intercepted and disclosed to the Third Parties.

107. **Adequate Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of members of the Class will be fairly and adequately protected by Plaintiff and her counsel.

108. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes. Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

# CAUSES OF ACTION

## COUNT I
### Violation of the California Invasion of Privacy Act, Cal. Penal Code § 631(a)

109.   Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

110.   Plaintiff brings this Count individually and on behalf of the members of the Class.

111.   CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

> *Or*

> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

> *Or*

> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

> *Or*

> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be

done any of the acts or things mentioned above in this section.

112.   CIPA § 631(a) is not limited to phone lines but also applies to "new technologies" such as computers, the Internet, and email.  *See Matera v. Google Inc.*, 2016 WL 8200619, at \*21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at \*1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

113.   The Third Parties' tracking technologies are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

114.   Both of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device."  *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).  Further, the Third Parties have the capability to use wiretapped information for their own purposes.  Accordingly, Meta and Google were third parties to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other.  *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

115.   At all relevant times, by their tracking technologies, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

116.   At all relevant times, the Third Parties used or attempted to use the communications intercepted by their tracking technologies for their own purposes.

117.    At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled the Third Parties to wiretap Plaintiff and Class Members using the Third Parties' tracking technologies and to accomplish the wrongful conduct at issue here.

118.    Plaintiff and Class Members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Class Members' electronic communications.   Nor did Plaintiff and Class Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct.

119.    The wiretapping of Plaintiff and Class Members occurred in California, where Plaintiff and Class Members accessed the Website and where the Third Parties—as enabled by Defendant—routed Plaintiff's and Class Members' electronic communications to the Third Parties' servers.

120.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT II
### Violation of the California Invasion of Privacy Act, Cal. Penal Code § 632

121.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

122.    Plaintiff brings this Count individually and on behalf of the members of the Class.

123.    CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

124.  The Third Parties' tracking technologies are "electronic amplifying or recording device[s]." *Id.*

125.  The California Reader Privacy Act, Cal. Civ. Code § 1798.90 states that a "book service" "shall not knowingly disclose to any government entity, or be compelled to disclose to any person, private entity, or government entity, any personal information of a user." Cal. Civ. Code § 1798.90(c).

126.  Per Cal. Civil Code § 1798.90(b)(2): "Book service" means "a service that, as its primary purpose, provides the rental, purchase, borrowing, browsing, or viewing of books."

127.  Per Cal. Civil Code § 1798.90(b)(5): "Personal information" means all of the following:

> (A) Any information that identifies, relates to, describes, or is associated with a particular user, including, but not limited to, the information specifically listed in Section 1798.80.

> (B) A unique identifier or Internet Protocol address, when that identifier or address is used to identify, relate to, describe, or be associated with a particular user or book, in whole or in partial form.

> (C) Any information that relates to, or is capable of being associated with, a particular user's access to or use of a book service or a book, in whole or in partial form."

128.  Here, Website users' communications with Defendant—made while browsing and reading digital reading materials via the Website—contain protected "personal information," namely "any information that relates to, or is capable of being associated with, a particular user's access to or use of a book service or a book." Cal. Civ. Code § 1798.90(b)(5)(C).

129.  First, OverDrive's service on its Website meets the Reader Privacy Act's definition of a "book service" since OverDrive's "primary purpose, [is to] provide[] the … borrowing, browsing, or viewing of books." Cal. Civ. Code § 1798.90(b)(2).

Furthermore, OverDrive does not satisfy the "book service" exclusion as its "book service sales" to libraries for its collections do "exceed 2 percent of [its] total annual gross sales of consumer products sold in the United States."[84] *Id.*

130.    Second, the communications include "information that relates to, or is capable of being associated with, a particular user's access to or use of a book service or a book, in whole or in partial form" including "[a] unique identifier or Internet Protocol address."    Cal. Civ. Code § 1798.90(b)(5)(B) and (C).    Defendant enables Meta to identify individual Website users by their respective Facebook accounts, utilizing several cookies, including the c_user; datr; fr; and _fbp cookies. Defendant also enables Meta to identify individual Website users through advanced matching, by which Meta records the contact details Website users provide on the Website (i.e., name, email address, phone number, etc.).    Defendant enables Google to identify individual Website users with Google Analytics identity spaces—a combination of user IDs, user-provided data (i.e., contact details like email address, phone number, name, and/or address, etc.), device IDs, and/or machine learning-based behavioral modeling—and Google signals (which associates web browsing activity with users' Google accounts).    These pieces of data collected by Meta and Google constitute information that "identifies, relates to, describes, or is associated with a particular user" (Cal. Civil Code § 1798.90(5)(A)), as the cookies and other IDs at issue contain "unique identifier[s] or Internet Protocol address[es]" assigned to Website users and other personal information associated with Website users sufficient to identify them. *Id.*

131.    Furthermore, Google intercepts Website users' button clicks and searches

---

[84] Nobile, Jeremy, *Crain's Newsmakers of the Year*, CRAIN'S CLEVELAND BUSINESS (Mar. 26, 2021), https://www.crainscleveland.com/awards/steven-potash-newsmakers-year-2021 (OverDrive "has indicated that upward of 95% of public libraries in the U.S. and Canada are among its client base.  Annual revenue in 2020 spiked 54% to $420 million, which ranks OverDrive as the 35th-largest privately held company in Northeast Ohio, according to Crain's research.").

selecting e-books or audiobooks that they then browse and read.  Google also intercepts the URL of webpages visited by Website users—containing the foregoing communications.  These communications therefore identify "a particular user's access to or use of a book service or a book."  Cal. Civ. Code § 1798.90(b)(5)(C).

132.    Thus, the Third Parties—as aided by Defendant—intercepted the protected reading preferences or "personal information," as defined in the California Reader Privacy Act, Cal. Civ. Code § 1798.90(b)(5)(C).

133.    Likewise, Defendant actions also flout the California Patron Use Records Act, Cal. Gov't Code § 7927.105, which has an expressed legislative intent to protect the privacy rights of individuals' reading materials.

134.    Therefore, Defendant's conduct here at issue was not favored by, *inter alia*, the California Reader Privacy Act and the California Patron Use Records Act.

135.    When communicating with Defendant, Plaintiff and Class Members had an objectively reasonable expectation of privacy, based on the Reader Privacy Act and Patron Use Records Act.  Thus, Plaintiff and Class Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other, third-party entities like Meta and Google would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

136.    Plaintiff and Class Members did not consent to any of the Third Parties' actions.  Nor have Plaintiff or Class Members consented to the Third Parties' intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

137.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

    (a)    For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

    (b)    For an order declaring that Defendant's conduct violates the statute referenced herein;

    (c)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

    (d)    For actual, compensatory, statutory, and/or punitive in amounts to be determined by the Court and/or jury;

    (e)    For prejudgment interest on all amounts awarded;

    (f)    For an order of restitution and all other forms of equitable monetary relief;

    (g)    For injunctive relief as pleaded or as the Court may deem proper; and

    (h)    For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

## **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  February 25, 2025        Respectfully submitted,

                        **BURSOR & FISHER, P.A.**

                        By:  */s/ Philip L. Fraietta*
                              Philip L. Fraietta

                        Philip L. Fraietta (State Bar No. 354768)
                        1330 Avenue of the Americas, 32nd Floor
                        New York, NY 10019
                        Telephone: (646) 837-7150
                        Facsimile: (212) 989-9163

E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ehorne@bursor.com

*Attorneys for Plaintiff*