**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
Max S. Roberts (*Pro Hac Vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com
mroberts@bursor.com

*Attorney for Plaintiff*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BETH CONE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>OVERDRIVE, INC.,<br><br>Defendant. | Case No. 2:25-cv-1617- FLA-MAA<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>Date: Aug. 22, 2025<br>Time: 1:30 p.m.<br>Ctrm: 6B<br>Judge: Hon. Fernando L. Aenlle-Rocha |

# TABLE OF CONTENTS

**PAGE**


INTRODUCTION .......... 1

ARGUMENT .......... 2

I. PLAINTIFF HAS ARTICLE III STANDING .......... 2

A. Plaintiff's Non-Anonymized, Private Reading Information Is Personal Information Protected By The Right To Privacy .......... 4

B. Plaintiff Was Injured Because Defendant's Conduct Deprived Her Of The Right To Control The Dissemination Of Her Personal Information .......... 5

C. Defendant's Authorities Are Inapposite .......... 6

II. DEFENDANT HAS NOT SHOWN PLAINTIFF CONSENTED TO THE SURVEILLANCE OF HER PRIVATE READING INFORMATION .......... 7

A. Defendant Has Not Shown That Plaintiff Was On Notice Of Or Consented To Its Privacy Policy Or Cookies Policy .......... 8

1. Defendant Has Not Shown That Plaintiff Was On Notice Of Or Consented To Its Privacy Policy .......... 8

2. Defendant Has Not Shown That Plaintiff Was On Notice Of Or Consented To Its Cookies Policy .......... 11

B. Defendant Has Not Shown That Plaintiff Was On Notice Of Meta And Google's Policies, Or That The Policies Would Disclose Meta And Google's Conduct To A Reasonable User .......... 12

III. PLAINTIFF STATES A CIPA § 631 CLAIM .......... 15

IV. PLAINTIFF STATES A CIPA § 632 CLAIM .......... 18

CONCLUSION .......... 20

# TABLE OF AUTHORITIES

PAGE(S)

## CASES

*Adams v. PSP Grp., LLC*,
691 F. Supp. 3d 1031 (E.D. Mo. 2023) .......... 7

*Berman v. Freedom Financial Network, LLC*,
30 F.4th 849 (9th Cir. 2022) .......... 9, 10

*Boelter v. Advance Mag. Publishers Inc.*,
210 F. Supp. 3d 579 (S.D.N.Y. 2016) .......... 4

*Brown v. Google LLC*,
685 F. Supp. 3d 909 (N.D. Cal. 2023) .......... 4, 18

*Byars v. Sterling Jewelers, Inc.*,
2023 WL 2996686 (C.D. Cal. Apr. 5, 2023) .......... 7

*Calhoun v. Google, LLC*,
113 F.4th 1141 (9th Cir. 2024) .......... 8, 13, 14

*Campbell v. Facebook, Inc.*,
951 F.3d 1106 (9th Cir. 2020) .......... 5

*Castillo v. Costco Wholesale Corp.*,
2024 WL 4785136 (W.D. Wash. Nov. 14, 2024) .......... 14

*Cook v. GameStop, Inc.*,
689 F. Supp. 3d 58 (W.D. Pa. 2023) .......... 7

*D'Angelo v. FCA US, LLC*,
726 F. Supp. 3d 1179 (S.D. Cal. 2024) .......... 10

*Dep't of Just. v. Reporters Comm. for Freedom of Press*,
489 U.S. 749 (1989) .......... 6

*Doe v. Tenet Healthcare Corp.*,
2025 WL 1635956 (E.D. Cal. June 9, 2025) .......... 16

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) .......... 6

*Farst v. AutoZone, Inc.*,
700 F. Supp. 3d 222 (M.D. Pa. 2023) .......... 7

*Frasco v. Flo Health, Inc.*,
2025 WL 1433825 (N.D. Cal. May 19, 2025) .......... 3, 5, 6

*Gladstone v. Amazon Web Servs., Inc.*,
739 F. Supp. 3d 846 (W.D. Wash. 2024) .......... 7, 18, 20

*Gray v. Amazon.com Inc.*,
2024 WL 2206454 (9th Cir. May 16, 2024) .......... 11

*Heerde v. Learfield Communications, LLC*,
741 F. Supp. 3d 849 (C.D. Cal. 2024) .......... 1, 4, 8, 16

*Heiting v. FKA Distributing Co.*,
2025 WL 1430663 (C.D. Cal. May 15, 2025) .......... 4

*I.C. v. Zynga, Inc.*,
600 F. Supp. 3d 1034 (N.D. Cal. 2022) .......... 7

*In re Carrier IQ, Inc.*,
78 F. Supp. 3d 1051 (N.D. Cal. 2015) .......... 17, 18

*In re DoubleClick Inc. Priv. Litig.*,
154 F. Supp. 2d 497 (S.D.N.Y. 2001) .......... 11

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .......... 2, 6, 17

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) .......... 14

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
934 F.3d 316 (3d Cir. 2019) .......... 3

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) .......... 14

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014) .......... 5

*Ingrao v. AddShoppers, Inc.*,
2024 WL 4892514 (E.D. Pa. Nov. 25, 2024) .......... 4

*Jackson v. Amazon.com, Inc.*,
65 F.4th 1093 (9th Cir. 2023) .......... 13

*James v. Walt Disney Co.*,
701 F. Supp. 3d 942 (N.D. Cal. 2023) .......... 4, 6, 7

*Jones v. Ford Motor Co.*,
85 F.4th 570 (9th Cir. 2023) .......... 3

*Lightoller v. Jetblue Airways Corp.*,
2023 WL 3963823 (S.D. Cal. June 12, 2023) .......... 6

*Long v. Provide Com., Inc.*,
245 Cal. App. 4th 855 (2016) .......... 9

*Mastel v. Miniclip SA*,
549 F. Supp. 3d 1129 (E.D. Cal. 2021) .......... 3

*McCoy v. Alphabet, Inc.*,
2021 WL 405816 (N.D. Cal. Feb. 2, 2021) .......... 14

*Mitchell v. Sonesta Int'l Hotels Corp.*,
2024 WL 4471772 (C.D. Cal. Oct. 4, 2024) .......... 18, 19

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) .......... 8, 9, 10

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016) .......... 8

*Price v. Carnival Corp.*,
712 F. Supp. 3d 1347 (S.D. Cal. 2024) .......... 7, 9

*R.C. v. Sussex Publishers, LLC*,
2025 WL 1735994 (N.D. Cal. June 23, 2025) .......... 13, 16

*Ramirez v. Trusper, Inc.*,
2024 WL 4479862 (N.D. Cal. Oct. 11, 2024) .......... 12

*Revitch v. New Moosejaw, LLC*,
2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) .......... 15, 17

*Ribas v. Clark*,
38 Cal. 3d 355 (1985) .......... 6, 17

*Salazar v. National Basketball Association*,
118 F.4th 533 (2d Cir. 2024)....................3

*Salazar v. Paramount Global*,
133 F.4th 642 (6th Cir. 2025)....................3

*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (2021)....................12

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018)....................11

*Smith v. Google, LLC*,
735 F. Supp. 3d 1188 (N.D. Cal. 2024)....................1, 13

*Specht v. Netscape Communications Corp.*,
306 F.3d 17 (2d Cir. 2002)....................9, 10

*Spokeo v. Robins*,
578 U.S. 330 (2016)....................3

*St. Aubin v. Carbon Health Techs., Inc.*,
2024 WL 4369675 (N.D. Cal. Oct. 1, 2024)....................16

*Stanley v. Georgia*,
394 U.S. 557 (1969)....................1, 4

*Strehl v. Guitar Center, Inc.*,
2023 WL 9700041 (C.D. Cal. Nov. 3, 2023)....................9

*Tattered Cover, Inc. v. City of Thornton*,
44 P.3d 1044 (Colo. 2002)....................4

*Tavernetti v. Superior Ct.*,
22 Cal. 3d 187 (1978)....................15

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................3

*Turner v. Nuance Commc'ns, Inc.*,
735 F. Supp. 3d 1169 (N.D. Cal. 2024)....................7

*Valenzuela v. Super Bright LEDs Inc.*,
2023 WL 8424472 (C.D. Cal. Nov. 27, 2023)....................15

*Vincent v. National Debt Relief LLC*,
2024 WL 3344227 (S.D.N.Y. July 8, 2024) .......... 11

*Wilson v. Huuuge, Inc.*,
944 F.3d 1212 (9th Cir. 2019) .......... 11

*Yockey v. Salesforce, Inc.*,
745 F. Supp. 3d 945 (N.D. Cal. 2024) .......... 17

*Yoon v. Lululemon USA, Inc.*,
549 F. Supp. 3d 1073 (C.D. Cal. 2021) .......... 10

*Yoon v. Meta Platforms, Inc.*,
2024 WL 5264041 (N.D. Cal. Dec. 30, 2024) .......... 13, 18

**STATUTES**

Cal. Civ. Code § 53.5 .......... 19

Cal. Civ. Code § 1798.90 .......... 1, 19, 20

Cal. Gov. Code § 7929.105(a) .......... 2

Cal. Gov't Code § 7927.105(a) .......... 19

Cal. Pen. Code § 631 .......... 15, 16, 17

## INTRODUCTION

Last week, a jury found that Meta violated Section 632 of the California Invasion of Privacy Act ("CIPA") by illegally recording users' private health communications through its Meta Pixel software-as-a-service.[1] Meta's technology at issue here is the same as in this jury verdict. In fact, Meta's technology at issue here is the same as this Court addressed in *Heerde v. Learfield Communications, LLC*, 741 F. Supp. 3d 849 (C.D. Cal. 2024) (Aenlle-Rocha, J.), in which the Court denied a motion to dismiss the plaintiff's CIPA § 631 claim where the website operator enabled Meta to collect video-viewing information. And Google's technology at issue here is the same as the technology courts have found violated CIPA §§ 631-632 where tax filing websites enabled Google to collect tax filing information. *See*, *e.g.*, *Smith v. Google, LLC*, 735 F. Supp. 3d 1188 (N.D. Cal. 2024). So, to say the least, courts have heard these claims before. Despite this, Defendant's Motion does not reinvent the wheel. Instead, it trots out the same routine defenses that this Court, numerous others, and now, a California jury have rejected time and time again.

What is not routine about this case is the information that Defendant enabled Meta and Google to collect: Plaintiff's and other Class Members' private reading information and library records. Decades ago, the Supreme Court formally recognized a right to privacy in what one reads. *See Stanley v. Georgia*, 394 U.S. 557, 565 (1969). California law codified this interest through at least two statutes. The California Reader Privacy Act prohibits the disclosure of "personal information" that "relates to, or is capable of being associated with, a particular user's access to or use of a book service or a book." Cal. Civ. Code § 1798.90(b)(5)(C). Likewise, the California Patron Use Records Act prohibits the unauthorized disclosures of information that identifies a library patron's "borrowing information or use of library information

---

[1] Allison Grande, *Meta Illegally Recorded Flo Users' Data, Calif. Jury Finds*, LAW360 (Aug. 1, 2025), https://www.law360.com/articles/2372590/meta-illegally-recorded-flo-users-data-calif-jury-finds.

resources" and "[a]ny written or electronic record that is used to identify a library patron." Cal. Gov. Code § 7929.105(a). And when Defendant enabled Meta and Google (the "Third Parties") to illegally intercept users' communications in violation of the CIPA, it enabled these third parties to collect—and thus, deprived users of the right to control—this private information. Compl. ¶¶ 1-2, 5, 31-33, 60-92, 93-96. Defendant's conduct here was also not an accident. Instead, Defendant deliberately employed the Third Parties to bolster its advertising revenue by allowing the Third Parties to harvest information, build comprehensive audiences, and enable advertisers like Defendant to better target users on social media platforms. *See id.* ¶¶ 93-96. The Ninth Circuit recognized the harm this conduct caused five years ago (*In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020)), and that harm has only been amplified by the privacy of the reading information at issue here.

For its part, Defendant admits it enabled the aforementioned conduct, but contends that users agreed to have their private reading information surveilled by two of the world's largest technology companies. Specifically, Defendant contends that, after a multi-step process involving at least two connecting hyperlinks, nearly five pages of scrolling, and another webpage containing *twenty other hyperlinks*, a user may just fortuitously stumble across the right link that Defendant meticulously inserted into the digital ether. Yet as the Ninth Circuit has found, this type of browsewrap is insufficient to construe notice to users like Plaintiff and putative class members. And as to Google and Meta's privacy policies, Defendant cannot claim a privacy policy *that it has presented no evidence users were on notice of* provides consent to any wiretapping. Defendant's Motion should be denied.

## <u>ARGUMENT</u>

### I. PLAINTIFF HAS ARTICLE III STANDING

As the Ninth Circuit and every other circuit court has held, the interception of web browsing information in violation of a privacy statute (including the CIPA) is sufficient for Article III standing. *See*, *e.g.*, *In re Facebook*, 956 F.3d at 596, 599 (9th

Cir. 2020) (finding Article III standing where "Facebook uses plug-ins to track users' browsing histories when they visit third-party websites, and then compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue"); *Jones v. Ford Motor Co.*, 85 F.4th 570, 574 (9th Cir. 2023) ("A statute that codifies a common law privacy right gives rise to a concrete injury sufficient to confer standing.") (cleaned up); *Salazar v. National Basketball Association*, 118 F.4th 533, 542 (2d Cir. 2024) (finding standing where plaintiff alleged his data "was disclosed as a result of an arrangement between the NBA and Meta pursuant to which the NBA deliberately uses the Facebook Pixel") (cleaned up); *Salazar v. Paramount Global*, 133 F.4th 642, 648 (6th Cir. 2025) (finding "Salazar's alleged injury—the disclosure of his 247Sports.com private video-viewing history to Facebook," sufficient to confer Article III standing).

Against this spate of authority, Defendant contends that Plaintiff lacks Article III standing because she "does not allege that the collection of information about her use of OverDrive.com injured her in any way whatsoever." MTD at 10-11. As the Third Circuit aptly put, "[i]n an era when millions of Americans conduct their affairs increasingly through electronic devices, the assertion … that federal courts are powerless to provide a remedy when an internet company surreptitiously collects private data [] is untenable." *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 325 (3d Cir. 2019).[2]

---

[2] Most of these decisions post-date *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) (and all post-date *Spokeo v. Robins*, 578 U.S. 330 (2016)), but even those that pre-date it remain good law. "*TransUnion* had nothing to say about the surreptitious appropriation of private … data," and "*TransUnion* did not affect a sea change in the law of standing." *Frasco v. Flo Health, Inc.*, --- F.R.D. ---, 2025 WL 1433825, at *12 (N.D. Cal. May 19, 2025); *Mastel v. Miniclip SA*, 549 F. Supp. 3d 1129, 1138 (E.D. Cal. 2021) ("*TransUnion* involved a fundamentally different type of alleged injury than the one here … which the Supreme Court analogized to the common law tort of defamation.").

### A. Plaintiff's Non-Anonymized, Private Reading Information Is Personal Information Protected By The Right To Privacy

Defendant argues that Plaintiff has not suffered an "actual injury" because "internet browsing activity [does not] qualify as private or personal information." MTD at 12:3-4 (quoting *Ingrao v. AddShoppers, Inc.*, 2024 WL 4892514, at *8 (E.D. Pa. Nov. 25, 2024)). But courts have routinely held that Internet browsing information such as "specific web pages viewed, search terms entered, and purchase behavior" constitutes "personal information." *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 949 (N.D. Cal. 2023); *Heiting v. FKA Distributing Co.*, 2025 WL 1430663, at *2 (C.D. Cal. May 15, 2025) (finding interception of "device and browser information, geographic information, referral tracking, and URL tracking" sufficed for Article III standing) (cleaned up); *Brown v. Google LLC*, 685 F. Supp. 3d 909, 941 (N.D. Cal. 2023) ("Ninth Circuit law indicates [] users [have a reasonable expectation of privacy] over URLs that disclose either unique search terms or the particular document within a website that a person views.").

The information here is even more private as it divulges the books that Plaintiffs viewed, borrowed/purchased, and read from libraries. Compl. ¶¶ 39, 61-63, 65-68, 70, 74-75, 81, 83, 85-86. This Court and others have found similar information to be "sensitive and confidential" because it "reveal[s] the specific content Plaintiffs consumed." *Heerde*, 741 F. Supp. 3d at 864 (discussing video-viewing information); *see also*, *e.g.*, *Stanley*, 394 U.S. at 565 (recognizing the right of the individual "to read or observe what he pleases—the right to satisfy his intellectual and emotional needs in the privacy of his own home"); *Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044, 1053 (Colo. 2002) ("Search warrants … demanding information about the reading history of customers, intrude upon the First Amendment rights of customers and bookstores because compelled disclosure of book-buying records threatens to destroy the anonymity upon which many customers depend."); *Boelter v. Advance Mag. Publishers Inc.*, 210 F. Supp. 3d 579, 599 (S.D.N.Y. 2016) ("Michigan is not

alone in concluding that disclosure to third parties of content that individuals choose to consume raises privacy concerns…").

This is on top of the California Legislature recognizing and codifying the privacy of this information. *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1117 (9th Cir. 2020) ("[L]egislatures may elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.") (cleaned up).

Further—and contrary to Defendant's argument (MTD at 12:13)—the information is not anonymous because it is tied to users' Facebook and Google accounts, which divulge users' identities. Compl. ¶¶ 70-90; *see also In re Zynga Priv. Litig.*, 750 F.3d 1098, 1107 (9th Cir. 2014) ("A Facebook ID identifies a Facebook user and so functions as a name or a subscriber number or identity.") (cleaned up). Regardless, the anonymity of the information is immaterial. As a district court recently held:

> [t]he fact that misappropriated data may be anonymized by stripping it from its owner and blending it with other data does not cure or wash away the original violation. A stolen diamond remains stolen even if it makes its way into a bag with legal stones or the thief does not know from whom he took it. To conclude otherwise would give carte blanche to obtaining and exploiting consumers' private and sensitive information without consent. Our case law underscores the principle that *the privacy injury occurs at the point of interception without consent, irrespective of whether the misappropriated data is anonymized.*

*Frasco*, 2025 WL 1433825, at *11 (emphasis added).

**B. Plaintiff Was Injured Because Defendant's Conduct Deprived Her Of The Right To Control The Dissemination Of Her Personal Information**

Defendant contends Plaintiff cannot allege a concrete injury because "[s]he does not claim, for instance, that her personal information was stolen and misused for identity theft or financial fraud" or "suffered physical or emotional injury." MTD at 11:1-3. Notwithstanding whether Defendant employing Meta and Google to intercept Plaintiff's private reading information without consent constitutes theft, Defendant

misunderstands the harm the CIPA protects against.

"The common law secures to each individual the right of determining, ordinarily, to what extent his thoughts, sentiments, and emotions shall be communicated to others." *Dep't of Just. v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763 n.15 (1989). To that end, the "right to privacy encompasses the individual's control of information concerning his or her person." *In re Facebook*, 956 F.3d at 598 (cleaned up). It is this historical privacy right that the CIPA was codified to protect. *See id.*; *see also Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (in describing purpose of CIPA § 631, noting the "simultaneous dissemination" of a conversation "to an unannounced second auditor … denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements"). And it is this privacy right that Defendant deprived Plaintiff of by causing her private reading information to be intercepted by the Third Parties without consent. *Frasco*, 2025 WL 1433825, at *12 ("[T]he loss of control over one's personal information is the 'concrete' harm, whether from stealing access to a personal diary in 1916 or obtaining user information in a healthcare app in 2016."); *James*, 701 F. Supp. 3d at 949. Indeed, "privacy torts do not always require additional consequences to be actionable … [in] the tort of intrusion upon seclusion … the intrusion itself makes the defendant liable." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) (cleaned up).

Thus, Plaintiff's injury here no mere technical violation. Instead, the CIPA "codif[ies] a substantive right to privacy [the right to control the dissemination of personal information], the violation of which gives rise to a concrete injury sufficient to confer standing." *In re Facebook*, 956 F.3d at 598 (cleaned up).

**C. Defendant's Authorities Are Inapposite**

Defendant's authorities contravene Ninth Circuit precedent (and the opinions of *every other circuit court*) and are distinguishable regardless. In *Lightoller v. Jetblue Airways Corp.*, 2023 WL 3963823, at *10 (S.D. Cal. June 12, 2023), the third party

only intercepted "flight pricing information," which was not "personal information," unlike Plaintiff's e-mail addresses, user IDs, and private reading information and preferences here. *See also James*, 701 F. Supp. 3d at 951 (distinguishing *Lightoller*). *Byars v. Sterling Jewelers, Inc.*, 2023 WL 2996686, at *1 (C.D. Cal. Apr. 5, 2023), unlike here, involved "a tester who has filed at least 100 similar lawsuits." Several of Defendant's authorities, unlike here, involved anonymized information. *Farst v. AutoZone, Inc.*, 700 F. Supp. 3d 222, 231 (M.D. Pa. 2023) ("Farst does not aver Autozone disclosued … any [] information that could potentially be used to identify him"); *Adams v. PSP Grp., LLC*, 691 F. Supp. 3d 1031 (E.D. Mo. 2023) ("[T]here are no specific allegations that [the plaintiff] shared any information about herself." *Id.* at 1041 (cleaned up); *Cook v. GameStop, Inc.*, 689 F. Supp. 3d 58, 66 (W.D. Pa. 2023) ("[E]verything Ms. Cook did on GameStop's website was completely anonymous. So, her allegations do not set forth a concrete harm."). *See also Price v. Carnival Corp.*, 712 F. Supp. 3d 1347, 1356 (S.D. Cal. 2024) (distinguishing *Farst* and *Cook*). And "*I.C. v. Zynga, Inc.*, 600 F. Supp. 3d 1034 (N.D. Cal. 2022) … was a data breach case," unlike this case, and "[t]hat context clearly informed the district court's assessment." *James*, 701 F. Supp. 3d at 951.

## II. DEFENDANT HAS NOT SHOWN PLAINTIFF CONSENTED TO THE SURVEILLANCE OF HER PRIVATE READING INFORMATION

Defendant contends that Plaintiff's claims fail because she "agreed to a privacy policy disclosing the challenged practice." MTD at 14. Of course, Plaintiff alleges she was not on notice of and did not consent to any wiretapping, much less any sort of privacy policy. *See*, *e.g.*, Compl. ¶¶ 5, 40, 42-43, 97-100, 115, 118, 136. Those allegations are sufficient at this stage. *See Turner v. Nuance Commc'ns, Inc.*, 735 F. Supp. 3d 1169 (N.D. Cal. 2024) (finding a lack of consent where plaintiffs alleged they "did not give their consent, written or otherwise, to either Nuance or Chase to allow Nuance to wiretap their confidential communications with Chase") (cleaned up); *Gladstone v. Amazon Web Servs., Inc.*, 739 F. Supp. 3d 846, 859 (W.D. Wash. 2024)

(same where the plaintiff alleged that "Capital One failed to provide notice that her calls would be recorded"). And as this Court has noted, "the question of express consent is usually a question of fact, where a fact-finder needs to interpret the express terms of any agreements to determine whether these agreements adequately notify individuals regarding the interceptions." *Heerde*, 741 F. Supp. 3d at 862 (cleaned up).

Regardless, "consent is an affirmative defense for which defendant bears the burden of proof." *Calhoun v. Google, LLC*, 113 F.4th 1141, 1148 (9th Cir. 2024) (cleaned up); *see also Heerde*, 741 F. Supp. 3d at 862 ("While the parties dispute who has the burden to show consent, district courts in the Ninth Circuit place the burden on Defendants, and this court follows.") (cleaned up). Defendant has not met that burden here.

### A. Defendant Has Not Shown That Plaintiff Was On Notice Of Or Consented To Its Privacy Policy Or Cookies Policy

As an initial matter, Defendant contends that Plaintiff consented to "OverDrive's terms and policies that tools like Google Analytics and Meta Pixel could be used to collect information about her use of the site when she used OverDrive's website." MTD at 14:6-7. But as Defendant admits, the link to its Privacy Policy is located "at the bottom of every page of its website," while the hyperlink to its Cookies Policy (together "the Overdrive Policies") is located "at the bottom of the 'OverDrive – Privacy Policy' subpage." MTD at 8:8-10, 9:20-21. Such browsewrap and "terms within terms" policies are unenforceable for lack of notice under Ninth Circuit law.

#### *1. Defendant Has Not Shown That Plaintiff Was On Notice Of Or Consented To Its Privacy Policy*

As to the Privacy Policy, the Ninth Circuit has long made clear that "[w]here the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014); *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016) ("[W]hen terms are linked in obscure sections of a webpage that users

are unlikely to see, courts will refuse to [enforce the agreement].").[3] "For an internet browsewrap contract to be binding, consumers must have reasonable notice of a company's 'terms of use' and exhibit 'unambiguous assent' to those terms." *Berkson v. Gogo LLC*, 9. F. Supp. 3d 359, 403 (E.D.N.Y 2015).

That is exactly the situation here. The hyperlink to Defendant's Privacy Policy is buried at least four screens down on its Website, at the very bottom of the page. Brooks Decl. Ex. G. This is the exact type of agreement "courts have refused to enforce." *Nguyen*, 763 F.3d at 1177; *see also Long v. Provide Com., Inc.*, 245 Cal. App. 4th 855, 866 (2016) (where scrolling was required on some webpages to find bring the hyperlinked terms into the screen, "review of the screenshots reveals how difficult it is to find the Terms of Use hyperlinks in the checkout flow *even when one is looking for them*") (emphasis in original); *Strehl v. Guitar Center, Inc.*, 2023 WL 9700041, at *6 (C.D. Cal. Nov. 3, 2023) ("If a purchaser clicks the first 'Complete Order' button, then Defendant's Purchase Terms hyperlink would constitute a browsewrap agreement. The hyperlink to the Purchase Terms would be located at the bottom of the screen, where it is reasonable likely that it would not be visible to the user unless the user scrolled down or zoomed out."); *Price*, 712 F. Supp. 3d at 1359 (refusing to enforce browswrap agreement and noting "[c]ourts have declined to enforce browsewrap agreements where notice … is only visible to users if they have scrolled down to the next screen") (cleaned up); *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 32 (2d Cir. 2002) (Sotomayor, J.) ("[A] reference to the existence of … terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice").

It is immaterial that the Privacy Policy hyperlink appeared "at the bottom of every page of [Defendant's] website." MTD at 8:7; *see also Nguyen*, 763 F.3d at 1177

---

[3] "New York and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term." *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) (cleaned up).

(rejecting argument that "the placement of the … hyperlink in the bottom left-hand corner of every page … is enough to place a reasonably prudent user on constructive notice"). "[W]here a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." *Nguyen*, 763 F.3d at 1178-79; *see also Specht*, 306 F.3d at 32 ("Internet users may have, as defendants put it, as much time as they need to scroll through multiple screens on a webpage, but there is no reason to assume that viewers will scroll down to subsequent screens simply because screens are there.") (cleaned up); *D'Angelo v. FCA US, LLC*, 726 F. Supp. 3d 1179, 1197 (S.D. Cal. 2024) (rejecting consent defense where defendant argued "the Website provides notice of its Privacy Policy to users multiple times and in multiple locations through a user's activity on the Website") (cleaned up).

Even if the hyperlink was conspicuous (and it is not), the Website does not "contain[] an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound." *Nguyen*, 763 F.3d at 1177. The hyperlink simply says "Privacy at OverDrive," without any advisal as to what action (if any) would bind a user to the Privacy Policy. Brooks Decl. Ex. G. That is not sufficient. *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1077 (C.D. Cal. 2021) (declining to find consent to privacy policy where "Lululemon did not ask Yoon to agree to the Privacy Policy; rather, Lululemon instructed Yoon that she could 'learn more' about the Privacy Policy when she placed her order."); *Berman*, 30 F.4th at 858 ("Both webpages stated, 'I understand and agree to the Terms & Conditions,' but they did not indicate to the user what action would constitute assent to those terms and conditions."). "The mere act of entering the Website here cannot constitute unambiguous assent to … the [Privacy Policy] because there is no evidence that prior to entering into the Website, Plaintiff was put on inquiry notice of the existence of

[Privacy Policy] or knew or should have known that Defendant would infer from her decision to enter the Website that she assents to the [Privacy Policy]." *Vincent v. National Debt Relief LLC*, 2024 WL 3344227, at *9 (S.D.N.Y. July 8, 2024).

Defendant's reliance on *Smith v. Facebook, Inc.*, 745 F. App'x 8 (9th Cir. 2018) and *Gray v. Amazon.com Inc.*, 2024 WL 2206454 (9th Cir. May 16, 2024) is misplaced because the plaintiffs in both cases conceded that they were bound by the respective terms and policies. *See Smith*, 745 F. App'x at 9 (plaintiffs agreed that they "gave general consent to Facebook's data tracking and collection practices."); *Gray*, 2024 WL 2206454, at *2 (finding "Plaintiffs do not challenge … that they accepted and are bound by the Alexa Terms of Use, which expressly incorporated the Amazon.com Privacy Notice."). In contrast, Plaintiff contests that she consented to Defendant's conduct. *See* Compl. ¶¶ 40-43, 97-100. *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d 497, 502-03 (S.D.N.Y. 2001) is even more, as the consent issue there concerned whether Doubleclick affiliated websites consented to Doubleclick's data collection practices for purposes of the Federal Wiretap Act. But unlike the Federal Wiretap Act, the CIPA is a two-party consent statute, meaning the consent of *all parties* to the communication (Plaintiff and Defendant) is required.

*2. Defendant Has Not Shown That Plaintiff Was On Notice Of Or Consented To Its Cookies Policy*

Defendant's Cookies Policy is even more inconspicuous than its Privacy Policy. As an initial matter, as Defendant admits, the hyperlink to its Cookies Policy is only available "at the bottom of the 'OverDrive – Privacy Policy' subpage." MTD at 9:22. But users have no notice of the hyperlink to the Privacy Policy page. Argument § II.A.1, *supra*. Thus, there is no notice of Cookies Policy page either.

Even if there was notice of the Privacy Policy page, that does not mean there was notice of the Cookies Policy page. Courts have refused to "enforce agreements where the terms are available only if users … complete a multiple-step process of clicking non-obvious links." *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1221 (9th Cir.

2019) (cleaned up). For instance, in *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 483-84 (2021), the court refused to enforce an arbitration agreement where "the only evidence in the record establishes the hyperlink does not take the consumer to terms advising them they would be bound by an agreement … Instead, the terms are available only if the consumer scrolls through … and clicks on a *secondary* link to the terms." (Emphasis added).

Here as well, even if a user scrolled down to the bottom of the Website and clicked on the link to the Privacy Policy, they would then be taken to a page with multiple hyperlinks and policies. Brooks Decl. Ex. H. A user would then need to figure out that the Cookies Policy was the relevant policy at issue—as opposed to a policy in any of the other *sixteen* hyperlinks—and click on that policy. *Id.*; *see also Sellers*, 73 Cal. App. 5th at 470 ("[C]onsumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound.") (cleaned up). And, as with the Privacy Policy, there is no language next to the hyperlink stating what action a user must take (if any) to agree to the Cookies Policy. Brooks Decl. Ex. H. Thus, Defendant's "terms within terms" approach is insufficient to put users on notice of the Cookies Policy. *See Ramirez v. Trusper, Inc.*, 2024 WL 4479862, at *6 (N.D. Cal. Oct. 11, 2024) ("[T]he multi-step process an internet user must endure to reach the 'terms page' hyperlink further minimizes the chance that they will receive notice of the terms of the Participation Agreement.").

### B. Defendant Has Not Shown That Plaintiff Was On Notice Of Meta And Google's Policies, Or That The Policies Would Disclose Meta And Google's Conduct To A Reasonable User

Defendant also contends that Plaintiff consented to the surveillance of her private reading information because "Plaintiff had both a Gmail account and a Facebook account and was required to accept Google's and Meta's respective terms of use, which describe in detail Meta Pixel's and Google Analytics' capability to collect data about her interactions with websites such as OverDrive's." MTD at 15:9-13. Not so.

*First*, although Defendant contends that Plaintiff "was required to accept Google's and Meta's respective terms of use" when she created a Google and Facebook account (MTD at 15:10), Defendant has not submitted the design and content of Google's or Meta's account creation screens at the time Plaintiff created an account. Under Ninth Circuit law, this is insufficient to show consent. *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1099 (9th Cir. 2023) (declining to find consent to updated terms where "Amazon did not provide the court with a copy or description of" the e-mail allegedly providing plaintiff on notice of the updated terms). "It is not sufficient to simply allege that the policies exist and Plaintiff[] created and used a Facebook [and Google] account to prove consent." *Yoon v. Meta Platforms, Inc.*, 2024 WL 5264041, at *4 (N.D. Cal. Dec. 30, 2024); *see also Smith v. Google*, 735 F. Supp. 3d at 1196 ("The mere existence of various terms of service and privacy policies cannot establish at this stage…"). Defendant must show how and where Plaintiff was put on notice of and assented to each of the terms it seeks judicial notice of. And although Defendant cites cases where courts found the plaintiffs were on notice of Google's or Meta's policies (MTD at 4, 6), but "Defendant does not cite any law … that Plaintiffs are somehow bound by" decisions in district court cases "to which [she] was not a party." *R.C. v. Sussex Publishers, LLC*, 2025 WL 1735994, at *3 (N.D. Cal. June 23, 2025).

*Second*, even if Defendant demonstrated Plaintiff was on notice of and assent to Google's and Meta's privacy policies (and Defendant did not), there was still no consent to the conduct at issue. To establish consent, Defendant must show that "a reasonable person understood that an action would be carried out so that their acquiescence demonstrates knowing authorization." *Calhoun*, 113 F.4th at 1147 (cleaned up). "If that user could have plausibly understood the disclosures as not disclosing that the defendant would engage in particular conduct, then the disclosures are insufficient to establish consent." *Id.* (cleaned up).

Here, Defendant relies on generalized notices in Google's and Meta's privacy policies. MTD at 5-6. But courts have routinely held that Meta and Google's policies are "too general to conclusively establish consent." *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 823 (N.D. Cal. 2020); *see also*, *e.g.*, *Castillo v. Costco Wholesale Corp.*, 2024 WL 4785136, at *12 (W.D. Wash. Nov. 14, 2024) ("[T]he 'generalized notice' in Meta's data-collection policies is insufficient to establish consent to collect personal health data."). On the contrary, "Meta policies … expressly provide that website developers will not share data that they know or reasonably should know includes … categories of sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines[)]." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 794 n.9 (N.D. Cal. 2022). Yet, the information here is defined as "sensitive" under California law, meaning Meta's policies "give a reasonable user the opposite impression regarding [Meta's] data collection practices." *Calhoun*, 113 F.4th at 1148 (cleaned up). Similarly, Google's policies state that it prohibits "customers from sending Personally Identifiable Information to Google Analytics" (Brooks Decl. Ex. B at 1), even though that is what Plaintiff alleges Defendant does here. Compl. ¶¶ 85-90.

Ultimately, the question of consent "must take into account the level of sophistication attributable to the general public," not a user with "the skill of an experienced business lawyer or someone who is able to easily ferret through a labyrinth of legal jargon to understand what he or she is consenting to." *Id.* at 1151. With this standard in mind, Defendant cannot show as a matter of law that a reasonable user like Plaintiff would understand, based on the labyrinth of privacy policies it attaches, that Meta and Google are collecting her private reading information. Thus, Meta and Google's privacy policies do not "establish[] an absolute bar to Plaintiff's claims." *McCoy v. Alphabet, Inc.*, 2021 WL 405816, at *6 (N.D. Cal. Feb. 2, 2021).

## III. PLAINTIFF STATES A CIPA § 631 CLAIM

CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978)." Plaintiff alleges that the Third Parties violated the second and third clauses of CIPA § 631(a) by "reading" or "learning the contents" of Plaintiff's communications "in transit" (the second clause) and using that information for their own purposes (the third clause). Compl. ¶¶ 115-116. And Plaintiff alleges Defendant violated the fourth clause of CIPA § 631(a) by "aid[ing], agree[ing] with, employ[ing]" or otherwise enabling the Third Parties' aforementioned CIPA violations. Compl. ¶ 117.

In retort, Defendant only contends that "Plaintiff does not plausibly allege that her communications were intercepted 'in transit or passing over a wire, line, or cable.'" MTD at 17:15-17 (citing Cal. Pen. Code § 631(a)). Thus, Defendant contends that because Plaintiff cannot satisfy the "in transit" element of the second clause of CIPA § 631(a), she cannot allege a claim against Defendant for a violation of CIPA § 631(a)'s fourth clause. As an initial matter, Defendant deliberately miscites the statute. Cal. Pen. Code § 631(a) prohibits eavesdropping on a communication of a message "while [it] is in transit or passing over any wire, line, or cable, *or is being sent from, or received at any place within this state*." (Emphasis added). Thus, "Section 631's protections extend explicitly to the beginnings and ends of communications." *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) (sustaining claim where "[e]ven if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device"). Regardless, Defendant is wrong.[4]

[4] Defendant does not contest that Plaintiff has stated a claim for Defendant aiding the Third Parties' usage of the intercepted information, which is covered by CIPA § 631(a)'s third clause. But to be fair to Defendant, Plaintiff must allege that the used information "was obtained through a violation of the first or second clauses" of the CIPA. *Valenzuela v. Super Bright LEDs Inc.*, 2023 WL 8424472, at *11 (C.D. Cal. Nov. 27, 2023). So all of Plaintiff's claims rise and fall with whether she has alleged the Third Parties intercepted her private information "in transit" (she has).

Defendant notes that the "communications are simultaneously and contemporaneously duplicated and sent to the Third Parties at the same time as they are being sent to Defendant," and contends "[a] duplication is not an interception; it necessarily occurs only after the communication has arrived at its destination." MTD at 18:15-19:1. This Court has already rejected that argument. *Heerde*, 741 F. Supp. 3d at 862 (sustaining CIPA § 631 claim involving Meta Pixel where "Plaintiffs allege that, after they entered their Search Terms, the Search Terms were replicated and sent in parallel to the tracking entities").

So too have other courts. *See*, *e.g.*, *Doe v. Tenet Healthcare Corp.*, --- F. Supp. 3d ---, 2025 WL 1635956, at *13 (E.D. Cal. June 9, 2025) ("Courts have held allegations of simultaneous duplication and interception of communications sufficient to plead 'interception' while 'in transit' under CIPA at the motion to dismiss stage."); *St. Aubin v. Carbon Health Techs., Inc.*, 2024 WL 4369675, at *6 (N.D. Cal. Oct. 1, 2024) (finding "in transit" interception based on allegations that "[w]hen a user accesses a website hosting the Facebook Pixel, Facebook's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Facebook's servers") (cleaned up); *R.C. v. Sussex Publishers, LLC*, 2025 WL 1735994, at *2 (N.D. Cal. June 23, 2025) (same where "Plaintiffs allege Defendant's website uses the Google Analytics Javascript code which, while Plaintiffs and Class members were and are interacting with the … website, Google, concurrently and in real time, did and does intercept, read, and analyze user communications and interpret the contents of those communications for Google subsequently to use for its advertising and analytics purposes") (cleaned up).

There is good reason why the weight of authority cuts against Defendant. At its heart, Defendant's argument boils down to the allegation that "any 'communication' is directly between the user's browser and the Meta/Google's servers, not with OverDrive." MTD at 18:19-21. This is a repackaging of an argument the Ninth Circuit already rejected: that "simultaneous, unknown duplication and communication of

GET requests do not exempt a defendant from liability under the party exception." *In re Facebook*, 956 F.3d at 608 ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion."). Reframing this argument as one about "in transit" interception should fare no better.

In addition, whether Meta and Google "directly" received the duplicated communications is immaterial. "Someone who presses up against a door to listen to a conversation is no less an eavesdropper just because the sound waves from the next room reach his ears directly." *See Revitch*, 2019 WL 5485330, at *2. For this reason, the "in transit" element of CIPA § 631 is met where the third parties receive the communications "before or simultaneously with" the intended recipient, as they do here. *Yockey v. Salesforce, Inc.*, 745 F. Supp. 3d 945, 953 (N.D. Cal. 2024) (cleaned up); *Ribas*, 38 Cal. 3d at 360-61 (noting CIPA protects against the "simultaneous dissemination [of a conversation] to an unannounced second auditor"). And here, the intended recipient of Plaintiff's private reading information was Defendant, *not* unannounced auditors like Meta and Google. *See* Compl. ¶¶ 5, 22, 34, 40. Indeed, Defendant acknowledges Plaintiff's allegation that "after the data is duplicated, it is 'then analyzed by the Third Parties before being provided to any entity that was a party to the conversations (like Defendant).'" MTD at 19:2-4 (quoting Compl. ¶ 93). Defendant "conflates Section 631(a)'s requirement of receipt by the intended recipient with receipt by the destination server. These are not the same thing." *Yockey*, 745 F. Supp. 3d at 953; *see also In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1081 (N.D. Cal. 2015) ("[E]very case cited by Defendants in this action involve situations where the transmission of the communication at issue had terminated and it had reached its *final destination,* even if only for a moment.") (emphasis in original).

Last, even if the communications rested temporarily on Defendant's servers before being passed to the Third Parties (which is not what Plaintiff alleges), such "resting" was "transient," "intrinsic to the communications process," and occurred

"contemporaneous[ly] with their transmission" such that the communication was not in storage when acquired by the Third Parties. *See In re Carrier IQ*, 78 F. Supp. 3d at 1080-82.

## IV. PLAINTIFF STATES A CIPA § 632 CLAIM

Defendant first argues that Plaintiff's reading information is not confidential because "no reasonable person could expect that her browsing on OverDrive.com would [] be private" in light of its privacy policy. MTD at 20:2-4. But Defendant has not met its burden to show that Plaintiff was aware of Defendant's Privacy Policy, or Meta's or Google's, much less that any of these policies disclosed the conduct at issue here. Argument §§ II.A-B, *supra*. This argument therefore fails. *See Gladstone*, 739 F. Supp. 3d at 859 (W.D. Wash. 2024) (sustaining CIPA § 632 claim "Plaintiff sufficiently alleges both that Capital One failed to provide notice that her calls would be recorded and that her calls were confidential communications"); *see also* Compl. ¶¶ 33, 135.

Defendant next argues Plaintiff's private reading information is not confidential because "[n]othing in the Complaint remotely serves to overcome the presumption that information collected online is not confidential." MTD at 20. This "argument, that California courts have developed a presumption that users do not have an expectation of privacy over internet communications, fails on examination." *Brown*, 685 F. Supp. 3d at 937. "[T]here is no requirement that Plaintiff allege something 'unique' about [her] particular Internet communications … to make them … confidential." *Mitchell v. Sonesta Int'l Hotels Corp.*, 2024 WL 4471772, at *10 (C.D. Cal. Oct. 4, 2024), *adopted as modified*, 2024 WL 4474491 (C.D. Cal. Oct. 4, 2024).

In any event, courts have widely recognized that personal reading information is entitled to heightened privacy protections. *See* Argument § I.A, *supra*. And courts have deemed online communications "confidential" when they contain information that is protected by a federal or state statute. *See, e.g.*, *Yoon v. Meta Platforms, Inc.*, 2024 WL 5264041, at *7 (N.D. Cal. Dec. 30, 2024) (finding "collected data" was

"confidential because it allegedly reveals the exact title of the video being watched," which is protected by the federal Video Privacy Protection Act); *Mitchell*, 2024 WL 4471772, at *1, *11 (finding "Plaintiff's interactions with a website … in the course of browsing and booking a hotel" were "'confidential' (irrespective of whether or not they fall within … California Civil Code § 53.5)").

That is the case here, where the California Legislature twice codified the right to privacy in consumer's personal reading information, in the Patron Use Records Act and the Reader Privacy Act. The Patron Use Records Act prohibits disclosure of "[a]ny written record or electronic transaction that identifies a patron's borrowing information or use of library information resources" to "[a]ny person, local agency, or state agency," except under specific circumstances that are not present here. Cal. Gov't Code § 7927.105(a). It further requires that "[a]ll patron use records of a library that is in whole or in part supported by public funds shall remain confidential." *Id.* § 7927.105(c). Because only library patrons can access e-books and audiobooks on Defendant's Libby App, which is prominently linked on Defendant's website, it was set up by the third parties to identify Plaintiff as a library patron and intercept her personal information, which is exactly what this statute sets out to prevent.

The Reader Privacy Act mandates that "[a] provider shall not knowingly disclose to any government entity, or be compelled to disclose to any person, private entity, or government entity, any personal information of a user," except under specific circumstances that are not present here. Cal. Civ. Code § 1798.90(c). [P]ersonal information" means, in part, "[a]ny information that relates to, or is capable of being associated with, a particular user's access to or use of a book service or a book, in whole or in partial form." *Id.* § 1798.90(b)(5).

Defendant asserts that these statutes do not support Plaintiff's allegations that she had a reasonable expectation of privacy because they "merely bar certain book services from disclosing certain information to any government entity, or from being compelled to disclose such information (e.g., by a court or law enforcement agency)

to any person." MTD at 21:1-6 (cleaned up). Defendant's argument is illogical. Based on privacy interests, the Reader Privacy Act would prevent a "book service" like Defendant from being "compelled to disclose to any person," such of Meta and Google, Plaintiff's private reading information. Cal. Civ. Code § 1798.90(c). Why would that privacy interest evaporate when Defendant itself is compelling the disclosure of Plaintiff's private reading information to Meta and Google?

Regardless, Defendant neglects the longstanding privacy protections that courts have afforded to reading information. Argument § I.A, *supra*. And Defendant ignores that the clear legislative intent behind these statutes is to accord privacy to consumers' personal reading information. *See* Compl. ¶¶ 18-30. For instance, the Legislative Counsel's Digest to Cal. Civ. Code § 1798.90 notes that the Reader Privacy Act was enacted to prevent providers of book services from disclosing or being compelled to disclose "any personal information relating to a user of the book service."

"Bearing in mind that a person's objectively reasonable expectation of confidentiality is generally a question of fact" (*Gladstone v. Amazon Web. Servs., Inc.*, 739 F. Supp. 3d 846, 859 (W.D. Wash. 2024) (cleaned up)), these laws support Plaintiff's reasonable expectation that Defendant, as an online library service, would not enable massive technology companies like Meta or Google to collect Plaintiff's personal reading information for marketing and advertising without notice or consent. *See* Compl. ¶¶ 18-22, 23-30, 48, 93-96, 97-100.

## **CONCLUSION**

For these reasons, the Court should deny Defendant's Motion to Dismiss. In the alternative, Plaintiff should be granted leave to amend.

Dated: August 8, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Philip L. Fraietta*
Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354765)
Max S. Roberts (*Pro Hac Vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: pfraietta@bursor.com
mroberts@bursor.com

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.1

The undersigned, counsel of record for Plaintiff, certifies that this brief contains 6,978 words, which complies with the word limit of L.R. 11-6.1.

By: */s/ Philip Fraietta*
Philip Fraietta